[S. F. No. 7598.   In Bank.—July 25, 1916.]

WESTERN GRAIN AND SUGAR PRODUCTS COMPANY (a Corporation), et al., Petitioners, v. A. J. PILLSBURY et al.; as Members of and Constituting the Industrial Accident Commission of the State of California, Respondents.

WORKMEN'S COMPENSATION ACT—JURISDICTION OF INDUSTRIAL ACCIDENT COMMISSION—CERTIORARI—REVIEW OF EVIDENCE.—Where the jurisdiction of the Industrial Accident Commission to make any award depends upon the establishment of the ultimate fact that the employee was murdered, the supreme court, in reviewing the award, may examine the evidence upon which the finding of the commission to that effect is based. If the evidence in any view is insufficient to justify the finding of death by violence, the court would be compelled to nullify the award.

ID.—MURDER OF EMPLOYEE—BURDEN OF PROOF—PROOF OF FACT OF DEATH.—In a proceeding before the Industrial Accident Commission to recover compensation for the death of an employee claimed to have been murdered in the course of his employment, the burden is upon the applicant to establish by competent evidence the fact of such death. Proof of such fact may be made by circumstantial evidence, and the actual finding of the body is not an indispensable requisite to the conclusion that the employee met his death by violence.

ID.—DEATH OF PERSON UNHEARD OF.—While a person unheard of for a time is presumed to be alive until the expiration of seven years, the absence, coupled with other circumstances, may be sufficient to prove death at a much earlier time.

ID.—SUFFICIENCY OF EVIDENCE TO SUPPORT FINDINGS.—On *certiorari* to review an award of the Industrial Accident Commission, the evidence is held sufficient to support the findings of the commission that the employee, a night watchman, for whose death the award was made,

was killed by violence, that his death was accidental and in the course of his employment.

ID.—NIGHT WATCHMAN KILLED IN COURSE OF EMPLOYMENT—ACCIDENT. The death of a night watchman, killed by violence while on the property which he was employed to watch, under circumstances indicating that he was slain at his post of duty and in its performance, results from accident within the meaning of the Workmen's Compensation Act.

APPLICATION to review an award of the Industrial Accident Commission of the State of California.

The facts are stated in the opinion of the court.

Chickering & Gregory, for Petitioners.

Christopher M. Bradley, and W. H. Pillsbury, for Respondents.

MELVIN, J.—*Certiorari* to review the award of the Industrial Accident Commission to the personal representative of one Edward Shea, upon the finding that the said Shea, who was a night watchman employed by Western Grain and Sugar Products Company, had met his death at the hands of persons unknown who had entered upon the property of his said employer. The findings and decision were made by a majority of the commissioners, Mr. Commissioner Weinstock writing a dissenting opinion.

Western Grain and Sugar Products Company had a warehouse in the town of Crockett, Contra Costa County. The property was bounded on one side by the straits of Carquinez, and on all the other sides was inclosed either by buildings or by a fence about eight feet in height. For some time prior to November 12, 1914, and on that day, Edward Shea had been employed as night watchman on the premises by the said company. On that night he entered upon his customary duties at about 10 o'clock. On the following morning he had disappeared and he has not been seen since. The facts and conditions upon which the majority of the commissioners founded their conclusion that Shea had been murdered were as follows: On the morning of the 13th of November three pools of fluid partly reddish and partly gray were found on the wharf on the property of the sugar products company. There were drops of fluid staining the wharf to its edge. There were

marks such as might have been made by dragging a body from these pools over the edge of the wharf and into the water. Shea's cap was found in or near one of these pools. It was torn and crumpled, the tear, however, not extending through the lining. The tear was in the back part of the cap at a place which, when the cap was worn, would be near the base of the skull. Shea's unopened knife lay just at the edge of the wharf. In the engine-room, where he made his headquarters, was found the card on which he checked off his hourly rounds, the entries indicating that he had made his last tour of duty about midnight. On the outside of the fence, which partially surrounded the property, were marks which might have been made by the feet of persons endeavoring to climb over. The fence was eight feet high, but these marks only extended three feet six inches from the ground. Just opposite the marks inside the fence were found footprints in the earth. It was the theory of the claimant that these had been made by some man or men jumping from the top of the fence, but one witness, Fox, the only person who spoke regarding their depth, said that the footprints were not deep enough to have been so produced. Early on the evening of the 12th of November two rough-appearing men had been seen in a saloon at Crockett. One of them had been heard talking with a third person about the advisability of going armed and had said that he always carried a weapon. About 7 o'clock on that evening, and again at a time near midnight, two men were seen at a point on the Southern Pacific right of way not far from the fence which we have described. One of these men was positively identified as one of the two who had visited the saloon at Crockett earlier in the evening. It was also in evidence that a door near the boiler-room was found open on the morning after the watchman's disappearance. This door might be unfastened from the outside only with a key but from the inside by a latch. It had a typical Yale lock. There was evidence also which tended to show that Shea's cap was not torn nor mutilated in any way when he left his home to go to his work at 9 o'clock on the evening of his disappearance. It was also shown by the uncontradicted evidence that Shea was sober, industrious, and apparently well satisfied with life; that he had no known enemies, and that his family relations were pleasant.

The water near the wharf was thoroughly dragged after Shea's absence was discovered, but no trace of the body of the missing man was found. Nothing was stolen from the premises, and there was no evidence of the absence of any articles which might have been used to weight a dead body. The testimony regarding the blood is well summed up in the dissenting opinion of Mr. Commissioner Weinstock as follows:

"If it were a fact that the large pools of blood were human blood or spinal fluid, it would lend color to the assumption that it was the blood of the deceased, and that he had been murdered. Under date of May 26, 1915, Dr. Victors, the bacteriologist to whom had been sent the blood in the possession of Sheriff Veale, reported thereon to the effect that the material which was actually blood was not human blood, and that of the two specimens sent, the one giving positive evidence of being animal blood was positively not human blood, and the other material, not having the visual characteristics of blood, gave one reaction indicating that it was human blood, and one reaction which is testimony against the theory that the fluid emanated from a human being."

The first attack of petitioners is upon the finding that Shea was murdered. As the jurisdiction of the Industrial Accident Commission to act at all depends upon this ultimate fact as found, we are not precluded from examining the evidence upon which it is based. If that evidence is not sufficient in any view to justify the finding of death by violence we will be compelled to nullify the award made by the Industrial Accident Commission. (*Del Mar Water, Light, and Power Co.* v. *Eshleman,* 167 Cal. 669, [140 Pac. 591, 948] ; *Great Western Power Co.* v. *Pillsbury,* 170 Cal. 180, [149 Pac. 35] ; *Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, [151 Pac. 398].) We shall determine whether or not there was substantial evidence that Edward Shea was murdered.

The burden was upon the applicant to establish by competent proof, the death of Shea. Doubtless such proof may be made by circumstantial evidence, and the actual finding of the body is not an indispensable requisite to a conclusion, in a civil case, that one has met his death by violence. While a person unheard of for a time is presumed to be alive until the expiration of seven years (*Benjamin* v. *District Grand Lodge etc.,* 171 Cal. 260, [152 Pac. 731] ; *Rogers* v. *Manhattan Life Ins. Co.,* 138 Cal. 285–294, [71 Pac. 348]), the absence,

coupled with other circumstances may be sufficient to prove death at a much earlier time. The case last cited is one in which the disappearance of a passenger from a steamer between ports and the finding of a note in which he declared his intention of drowning himself, together with other circumstances, were held sufficient to "quicken the time" so as to raise the presumption of death before the expiration of the statutory period fixed by subdivision 26 of section 1963 of the Code of Civil Procedure. Petitioner contends that the test to be applied in such a case as this is whether or not there is substantial evidence which would render death more probable than a continuation of life, citing in support of that rule such cases as *Rogers* v. *Manhattan Life Ins. Co.*, 138 Cal. 285, [71 Pac. 348] ; *The San Rafael*, 141 Fed. 270, [72 C. C. A. 388], and *Fidelity Mut. Life Assn. Co.* v. *Mettler*, 185 U. S. 308, [46 L. Ed. 922, 22 Sup. Ct. Rep. 662]. Measured by such authorities the facts presented by the testimony given before the Industrial Accident Commission are sufficient to justify the finding of death by violence. Indeed the circumstances are quite as convincing as those reviewed in any of the opinions cited. Even if we eliminate the marks on the fence and footprints on the ground there is left substantial evidence of violence. The wharf was accessible from the water, and the assailant or assailants of the night watchman might have come by boat. The open door might indicate that at least one person went out through it, and the condition of the door would fit either the theory of murder or that of a fabricated appearance intended to create the idea that Shea had been killed. But nevertheless we cannot say that there was not sufficient evidence to support the finding which is attacked. Undeniably if there was blood of one of the lower animals on the wharf that fact would lend strength to the suspicion that Shea might have invented the circumstantial evidence. The expert who examined the specimens of fluid taken from the wharf did not testify before the commission personally, and it does not appear from the record before us by what method he reached his conclusions. If he had reported that *all* of the specimens were of other than human origin, and if the commissioners had felt themselves bound to accept his deductions, there would be very strong ground for suspecting that Shea had fabricated the appearances of violence. But his report was that *some* of the fluid gave a reaction indicating that it

was human blood. The specimens were taken from the same vicinity. The surroundings indicated that they came from the same source. The mixed result of the expert's experiments, therefore, would indicate that his method of examination was faulty. It was evidently some chemical process because "reactions" are mentioned. It does not appear that microscopy was resorted to and that the usual method of measuring corpuscles by use of a micrometer was followed. But whatever the process adopted, the result was such as would justify the commissioners in placing small weight upon the statement that the blood of one of the lower animals was in the pool. As counsel for respondent well expresses it: "The only effect of the test was to prove its own inconclusiveness."

The other circumstances speak most eloquently against the theories of suicide or flight and in support·of that of death by violence. The torn cap which had been intact when Shea put it on, the marks on the wharf as of a body dragged to the edge, the location of the knife indicating that it probably dropped from a pocket as the body was lifted for its disposition either in the water or a waiting boat, the burning lantern, the coat left in the boiler-room, the happy nature of the man, and his home life—all of these things indicate that his disappearance was due to his death by violence, and not to an intentional desertion of his wife and minor children. He had been married for thirty-three years and had a family of nine children, four of them still minors, and three of these wholly dependent upon him for support. It is highly improbable that such a man would desert his family, and it is reasonably certain that he was killed just as the circumstances indicate that he was. We conclude therefore that the finding as to the death of Shea and the manner thereof must stand.

Petitioners make the further contention that even if the *fact* of death by violence be conceded, the evidence does not warrant the finding that it was accidental and in the course of the watchman's employment. *Price* v. *Occidental Life Ins. Co.*, 169 Cal. 800, [147 Pac. 1175], is cited as authority for the proposition that the possibility of Shea's death as a result of a conflict brought on by himself should have been negatived by the claimant. There is no merit in the contention and the cited case does not support it. In the Price case, it was merely decided that where death from a bullet wound caused by the discharge of a revolver in the hands of another is

alleged, a finding that death was not caused by accidental means is to be sustained upon a showing that it resulted from a conflict brought on by the person who was afterward killed. The rule has no application to the facts in the proceeding under review. Shea was on the property which he was employed to watch, and the circumstances indicate that he was slain at the post of duty and in its performance. A schoolmaster killed while trying to subdue two rebellious students was held to have met his death from "accident" within the meaning of the compensation law. (*Trim Joint District School* v. *Kelly,* W. C. & Ins. Rep., 359.) An assault upon a foreman by a vicious employee has been similarly classified by this court (*Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686, 703, [151 Pac. 398]), and in the recent case of *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal. 407, [156 Pac. 491, 496], it was held that the surviving dependents of a night watchman, who was murdered while on duty, were entitled to compensation under the statute of California.

Other contentions were made by petitioners, but these have been settled by decisions of this court filed since the briefs herein were written. Therefore we will not discuss the said contentions.

The award is affirmed.

Shaw, J., Sloss, J., Lorigan, J., Henshaw, J., Lawlor, J., and Angellotti, C. J., concurred.

Rehearing denied.