## O. W. AKERSON v. GREAT NORTHERN RAILWAY COMPANY.[1]

March 14, 1924.

No. 23,763.

**Verdict set aside because of failure of proof.**

    1.   In an action for death by wrongful act, where it is claimed that deceased slipped and fell in front of a train, on negligently permitted accumulations of ice and cinders on a crossing, recovery denied because of the absence of proof showing that deceased was on the crossing when he was struck by the engine pilot.

**When inference from fact must be disregarded.**

    2.   Although a given inference may flow from a part of the facts in evidence, it must be disregarded if it is wholly inconsistent with, and repelled by, other facts conclusively proven.

**When pedestrian at railway crossing is guilty of contributory negligence..**

    3.   If a pedestrian who is struck by a passenger train must be held to have known of its close approach, he is guilty of contributory negligence as a matter of law, even though in attempting to cross ahead of the train he stumbled or slipped and fell, and would not have been injured except for the fall.   Due care for one's safety does not permit

[1]Reported in 197 N. W. 842.

the taking of such chances, and calculating so closely one's ability to beat the train.

**When presumption that person exercised due care is destroyed.**

4. The presumption that a person fatally injured in attempting to cross ahead of an approaching passenger train was in the exercise of due care is destroyed by the circumstance that he must have been fully aware of the dangerously close approach of the train at the moment he attempted to cross.

Action in the district court for Isanti county by the administrator of the estate of Andrew Leaf, deceased, to recover $7,678.88 for the death of his intestate. The case was tried before Giddings, J., who at the close of the testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $7,500. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed.

*Hoke, Krause & Faegre,* for appellant.

*Godfrey G. Goodwin* and *Olof L. Bruce,* for respondent.

STONE, J.

Action for death by wrongful act wherein there was a verdict for plaintiff. The appeal is from the denial of defendant's blended motion for judgment notwithstanding the verdict or for a new trial.

Respondent's intestate, Andrew Leaf, then a vigorous man of 47 years, came to his death through injuries sustained about 4 o'clock a. m., December 30, 1916, at Grandy in Isanti county. Mr. Leaf was on his way to the depot, there to board the incoming train, and while attempting to cross the track in front of it received his fatal hurt.

Defendant's main line runs through Grandy from the north. It is flanked on the east, first by a side track, and then a house track. The depot is immediately west of the main line. Running north from it is a cinder platform, close enough to the main line for the convenience of passengers boarding or alighting from passenger trains. The north end of this platform is approximately 70 feet from the north end of the depot. Lake avenue, at this point ap-

parently nothing more than a rural highway, crosses the tracks almost at right angles just north of the station grounds, the center of the roadway being about 35 feet from the north end of the cinder platform. It is on this crossing that the deceased is claimed to have been struck.

The alleged negligence consisted in the failure of defendant to keep the crossing free from obstructions, such as are sometimes caused by snow, ice or cinders. The duty so to do is predicated by plaintiff upon sections 4256 and 4257, G. S. 1913.

The night of the accident was very cold. There was a small amount of snow which had been on the ground for some time. We assume that the slippery accumulations of ice and ice covered cinders, upon which the case for plaintiff is made to rest, were on the crossing as claimed.

The residence of deceased, on his farm just outside Grandy was so close to the station that, in order to catch the southbound train at night, he did not have to leave home until after he saw the headlight as it came into view some miles to the north. He followed that practice on the morning in question, leaving home after he saw the headlight, and, as he supposed, in ample time to make the station ahead of the train. In that, unfortunately, he failed, and, somewhere between the crossing and a point not less than 40 feet north of the north end of the depot, he was caught on the engine pilot and fatally injured.

Certain ante mortem statements were admitted as part of the res gestae. To one witness he said: "If I hadn't slipped and fell I would have had plenty of time to get over; I had plenty of time but slipped and fell * * * I was struck by the train * * * in the side and chest * * * and the right arm." To another witness he said: "I fell down, scrambled to my feet and fell down again and before I could get out of the way the train struck me." Another witness, to whom Mr. Leaf talked just after the accident, testified: "He said I fell in front of the train, he said he had a new pair of shoes on and I slipped and fell and got hit from the train."

The only other evidence throwing any light on the location of Mr. Leaf at the moment he was struck, is that of the engineer who from his seat on the right side of his cab (the depot side), first saw the deceased. He testified: "Well, when I was about half ways between the crossing and the depot I saw a man going onto the platform of the depot, with his arms out like that, and my first impression was  *  *  *  that he had jumped off the pilot when I slowed down for the station." This occurred closer to the depot than the crossing. "His arms were out in front of him and he went right from the pilot to the platform  *  *  *  straight out onto the platform." He was too badly injured to have been able to make any effort to jump from pilot to platform.

A blood spot was found, according to a principal witness for plaintiff, on the platform north of the depot, "about half ways from the depot to the end of the platform." That witness opined that this blood spot was about 100 feet from the crossing. That is an unintentional overstatement, for midway of the platform is approximately 70 feet from the center of the roadway over the crossing.

The location of that blood spot; the testimony of the engineer and that showing where Mr. Leaf was found on the platform, are the only evidence going to show just where the deceased was when he was struck.

It is urged that Mr. Leaf's only route from his residence was along the highway, over the crossing of the main line, and then at a right angle to the left, to the north end of the platform. But the record does not sustain that view, or even point to its probability.

The platform was low, not more than 6 inches above the rails. Mr. Leaf, as he approached the station, may have realized that he had no time to spare if he were to make the platform ahead of the train. There was no obstruction preventing his taking a cross-cut from any point on Lake avenue, near or on the house track crossing, to whatever place he wanted to reach on the platform.

So far as probabilities are concerned (and aside from the evidence tending to show that he was not on the crossing when struck), he was as likely to have cut diagonally across the tracks south of the crossing, as he was to attempt to continue clear across the tracks

on the highway, and then make an abrupt turn to the south. Save for the rails and a little snow, there was as good footing and as clear going on this short cut as on the roadway. He had no time to spare and by the cross-cut could have saved an appreciable moment. Because of his alert vigor, it is not at all likely that he chose the circuitous rather than the direct route. His immediate concern was to make the platform ahead of the train.

If, therefore, thus far it were a mere matter of conflicting but possible inferences, there would be no more reason for concluding that the deceased was struck on the crossing than at a point well to the south of it.

But the evidence tends to show that he wasn't on the crossing when struck. If the measurements we have given are referred to, it will be observed that, in order to project him to the point where he struck the platform, the engine, if it caught him on the crossing, must have hurled him more than 50 feet, probably 60, almost directly in front of it, at a moment when it was pretty well slowed down to make the station stop.

That seems highly improbable, if not altogether impossible. Aside from that, the testimony of the engineer, corroborated by the location of the blood spot on the platform, indicates that it was just about at that point that the deceased was caught by the pilot, which doubtless caromed him upwards, to the right and onto the platform.

It is futile to suggest that Mr. Leaf was caught on the crossing and carried any distance at all on the pilot, and *jumped* from it to the platform. He could not rise after striking the platform and was almost unconscious when picked up a moment later. His right side was badly crushed ("caved in" is the doctor's description), and both legs "terribly bruised." His injuries were such, aside from the shock alone, from which he did not recover for some time, as to deprive him of the very substantial ability requisite for a leap from the pilot to the platform. It is 16 to 18 feet from the center of the track to where Mr. Leaf was found.

Moreover, and this appears fairly from the record—if Leaf had held to the pilot, momentarily even, and did not jump off (and he

couldn't have done that), he would not have been projected forward or sideways, but would have gone down and under the pilot, or would have been pushed, not thrown, to one side.

But he was thrown from the pilot, and with such violence that he was projected some distance. It seems obvious, therefore, that he was so thrown by the first impact of the engine, and that he was struck at a point on the track nearly opposite the place where he fell on the platform. That, of course, could not have been on the crossing nor within 40 or 50 feet of it.

We have searched the record in vain for circumstances justifying a legitimate inference—something amounting to more than a mere guess or the suggestion of a remote possibility—that Mr. Leaf was struck on the crossing. A majority of the court find nothing approaching that appreciable quantum of proof required of one having the ultimate burden of proof before, by judicial processes, he can have transferred to himself money or other property which is not his.

For the reasons indicated, a majority of the court is of the view that the evidence does not justify an inference that Mr. Leaf was struck on the crossing. We feel that the evidence does not show even a remote possibility that the accident occurred on the crossing. But passing all that, and assuming, arguendo, not only a possibility but also a deduction of that kind to be presented by the evidence, we are still within the rule:

"That an inference should not be adopted from a few of the facts proved when it is absolutely inconsistent with, and repelled by other equally well proved facts." U. S. Fidelity Co. v. Des Moines Bank, 145 Fed. 273, 74 C. C. A. 553; Bowsher v. Grand Rapids & I. Ry. Co. 174 Mich. 339, 140 N. W. 524; 23 C. J. 55.

Here, if from some of the facts an inference might be drawn that Mr. Leaf was struck on the crossing, we would still have to conclude that it was repelled by other and more controlling facts conclusively proven.

It is more accurate, however, to say that the assumed inference is impossible because the evidence shows that, when he was struck, Mr. Leaf was 40 feet or more south of the crossing.

We go now to the question of the negligence of the deceased.

A pedestrian or the driver of a vehicle is ordinarily guilty of contributory negligence if he violates the stop, look and listen rule. 2 Dunnell, Minn. Dig. § 8193. Contributory negligence remains a question of fact where distracting or other circumstances, such as obstructions of the view, make possible an inference that the rule was obeyed and that the injured person was, notwithstanding such obedience, unaware of the approaching engine or cars.

Weiss v. Great Northern Ry. Co. 119 Minn. 355, 138 N. W. 423, is an illustrative case. There the plaintiff was run into after dark on a village crossing. There was a high wind which might have prevented her realizing, through the sense of hearing alone, the dangerously close approach of the train. The main issue was as to whether the headlight was burning. Because that was an issue of fact, the question of contributory negligence was held to have been properly submitted to the jury. Knudson v. Great Northern Ry. Co. 114 Minn. 244, 130 N. W. 994, is a similar case. There the "dim headlight" was "no better than a smoky lantern." It was characterized by Mr. Chief Justice Start as a "delusion rather than a warning."

These cases show how unavoidable is the conclusion of contributory negligence in the instant action, for there is no attempt to deny that Mr. Leaf must have known—unless for the moment he had become wholly unmindful of his surroundings—of the dangerously close approach of the train.

The deceased was on his way to board the very train that ran him down. He had waited at his home until its headlight pierced the northern horizon. It follows that he was fully aware of the approach of the train and probably of its precise location. Not having allowed himself quite enough time, he must have been trying to beat the train to the depot. Very likely that is what happened. Either that, or the unfortunate man, at the time being, was abstracted and not taking care for his own safety. In either event, the conclusion of contributory negligence is inescapable within the rule of such cases as Wardner v. Great Northern Ry. Co. 96 Minn. 382, 104 N. W. 1084; Martin v. Great North. Ry. Co. 132 Minn. 78, 155 N. W. 1047; Knapp v. North. Pac. Ry. Co. 139 Minn. 338, 166 N. W. 409;

Wesler v. Chicago, St. P. M & O. Ry. Co. 143 Minn. 159, 173 N. W. 565; Anderson v. Great North. Ry. Co. 147 Minn. 118, 179 N. W. 687; Engel Ry. Co. v. Minneapolis St. Ry. Co. 149 Minn. 356, 183 N. W. 842.

As was said by the late Chief Justice Brown in the Wardner case, the deceased "took the chances in attempting to cross ahead" of the oncoming train. In consequence, "in the absence of reasonable explanation there was no question for the jury to pass upon." That is the situation here, for surely the record presents no explanation —other than that of an utter failure to care for his own safety— why Mr. Leaf was run down. The chance of a slip, stumble or fall in front of a closely approaching passenger train is one of the things which a pedestrian cannot take, and at the same time be considered in the exercise of due care. It is not permitted to calculate so closely the chances of coming off victorious in such a race with a passenger train.

The close approach of the train having been known to the deceased, it is a case for the application of the rule stated by Judge Lees in Anderson v. Great North. Ry. Co. supra, that "a conclusive presumption arises," that he heedlessly disregarded his knowledge of the impending danger and negligently encountered an obvious, and as it turned out, a fatal hazard.

Of course, if the facts were not conclusively to the contrary, we would indulge—as in every similar case we seek carefully for the opportunity to indulge—the presumption that the deceased used due care to avoid injury. But, as indicated by Mr. Justice Holt in Knapp v. North. Pac. Ry. Co. supra, that presumption is "destroyed" when it appears from the undisputed evidence that, if the deceased had looked and listened before going upon the crossing, he would have discovered the approaching train. Here, deceased knew, or ought to have known, just where the train was. That circumstance alone proves his contributory negligence as a matter of law.

The order appealed from is reversed and the case remanded with directions to enter judgment for defendant.

HOLT, J. (dissenting)

The case for plaintiff is weak; the defense of contributory negligence strong. But it seems to me both questions were for the jury. The fact that Leaf struck the platform of the depot some 70 feet south of the crossing, to my mind, does not conclusively establish that he was not upon the crossing when hit. The slant of the pilot, or involuntary grasping for support would tend to hold him to the engine for a second or two and that would suffice to carry him the distance mentioned. The speed of the train was then not so great that Leaf would have been hurled through the air any appreciable distance. Striking a human body and an inanimate unyielding substance are different propositions. The only witness who saw Leaf about the time of the collision was the engineer, and to him it appeared as if Leaf was getting off the pilot with hands outstretched. He fell on the platform at right angles to the locomotive. This indicates more a jumping or falling from a position than being thrown bodily through the air. The evidence also indicates a well-defined path from the crossing to the platform some eight feet west of the tracks. It is not likely that a person acquainted with the situation, in the face of an approaching train would cut across diagonally and expose himself to the danger of stumbling over the outstanding rails of three tracks.

DIBELL, J. (dissenting)

I agree with Mr. Justice Holt.