# MARY SIVALD v. FORD MOTOR COMPANY.[1]

March 24, 1933.

No. 29,110.

*Doherty, Rumble, Bunn & Butler,* for relator.
*Robert E. Faricy* and *McMeekin & Quinn,* for respondent.

WILSON, CHIEF JUSTICE.

Certiorari to review an order of the industrial commission award-
ing compensation for the death of John Sivald, who was murdered
on the night of November 21, 1930, while in the employ of the
relator.

Sivald was employed as a night watchman in a ten-story build-
ing owned by relator in the industrial district near railway yards
in the city of Minneapolis. There were three watchmen, working
eight-hour shifts, so one watchman was always on duty. Sivald's
shift was from four p. m. to midnight. The building was empty.
It was the duty of the watchman to look after and protect the
building, keep it clean, sweep the floors, do such painting, plaster-
ing, and repairing as was needed. The building was not heated.
These men used flash lights and portable extension lights which

[1]Reported in 247 N. W. 687.

could be carried from floor to floor and connected with electric light sockets.

Each watchman made the rounds of the building once during his eight-hour shift. He was required to push the time clock every half hour from the floor on which he was working. On the night in question the clock dial disclosed that Sivald pushed the station on the fifth floor regularly until about 6:20 p. m., indicating that he was working on the fifth floor between 4 p. m. and 6:20 p. m. He then made a complete round of all floors and pushed the clock on the tenth floor about 7:15 p. m., this being the last push appearing on the dial.

The doors and apparently the basement and ground floor windows, if not all windows of the building, were kept closed and locked. There was an elevator in the building which the watchmen could use in going from one floor to another. The top of the elevator cab was covered with a metal wire screen.

On the night in question the watchman for the next shift, Mr. Bleed, came to the building a little after 11 o'clock p. m. He found the door locked and waited for Sivald to come and let him in, as was customary. He rang the bell but got no response. Access to the building was difficult. He climbed over a wire fence into an inclosure at the side of the building where there was a small shack, used by the watchmen, in which there was a stove. In the basement wall just back of this shack was a window. Bleed found this window unlatched, opened it, and entered the building. He went up the stairs from floor to floor looking for Sivald. There was a light on the fifth floor. The elevator cab was there, with the gate open. Bleed then found Sivald's body lying on the floor of the elevator cab, with the head crushed. He observed that Sivald had apparently come through the screen on top of the cab. Subsequent investigation on the tenth floor disclosed that blood spots on the floor indicated that something had been dragged to the elevator shaft. The wooden gate to the elevator was out and had been put aside, and the elevator shaft was open. Sivald's cap and flash light were lying on the floor near by. It seems plain that Sivald

was assaulted by some person on the tenth floor of the building and dragged to and thrown down the elevator shaft so as to crash through the screen top of the cab then standing at the fifth floor.

The record is conclusive that the building contained nothing to attract thieves; that nothing was taken from the building or in any way damaged therein; that nothing was taken from the person of the employe, as the property in his possession at the time he left his home for work was still on his person after his body was discovered.

For about a year prior to the murder Henry Durvald lived with the employe and his family. Durvald was an alien and has since been deported to Germany for unlawful entry into this country. In Germany, since the war, Durvald had been convicted of 18 major and 18 minor crimes and had actually been in prison in Germany for about four years. Bitterness existed between Durvald and Sivald growing out of the attentions paid Sivald's wife by Durvald. They had made threats against each other. Sivald's wife was friendly with Durvald. Sivald wanted Durvald out of his home. Mrs. Sivald apparently wished him to remain. The testimony is that she showed affection for him. One witness says he saw her throw her arms around him and heard her call him sweetheart. Ten days before the murder Durvald was very angry with Sivald. He claimed that Sivald did not use Mrs. Sivald well, and he said Sivald wanted to get him, Durvald, out of the house. Shortly before Sivald's death Durvald on different occasions spoke ill of him and referred to him as a "son-of-a-bitch" and said, "I will get him."

Perhaps the strongest evidence of a gathering storm was the fact that about two o'clock p. m. on the afternoon of the day he was murdered Sivald talked to an intimate friend, who disclosed on the witness stand the talk in this language:

"It was about two o'clock, I guess, in the afternoon, at the time I delivered milk, I don't know the exact time, and John [Sivald] was getting ready to go to work, when I left I had my car back in the alley and he come and talked to me and wanted to know, he

said he wanted to talk to me, he said we had always been very intimate and wanted to ask me something and see what I thought about it. I could see something was apparently troubling him, he acted as though he was about ready to cry, his feelings were hurt or something, and he asked me if I thought Henry Durvald had anything to do with his wife. I said I did not think so. * * * I told him I did not think so, and he said he was going to throw him out of the house."

After the murder petitioner was not frank with the police who were investigating the crime. She advised friends and her own daughter not to talk too much, as they might get into trouble. The wife's conduct tended to obstruct the full investigation that the facts deserved. Neither she nor Durvald offered the authorities assistance in their investigation. When Durvald was questioned as to his whereabouts on the night of the murder he gave a false alibi. When he was later arrested for deportation, Mrs. Sivald mortgaged her home to get him a bond for his release.

The employe was feloniously murdered. That is conceded. That occurred while he was engaged in the course of his employment. The sole question before us is to determine whether or not the evidence is sufficient to support a finding that his death arose out of his employment. This rests upon circumstantial evidence.

The argument for the affirmative is that Sivald was to watch the building, to protect it from prowlers who might otherwise gain entrance and do damage to it, as well as to watch for fires and keep the building clean; that in an industrial section of a large city near the railway yards prowlers are apt to enter vacant buildings and deface and damage them and by careless use of matches and cigarets may cause fires. It is said that such persons, confronted by a watchman, may commit an assault; and that the character of such prowlers constitutes danger. Thus the claim is asserted that the work of a watchman in such a building in the nighttime exposes him to hazards peculiar to his employment. The difficulty with this line of argument is that it suggests possibilities. But were such possibilities ever realized? We certainly do not know. The

circumstances are insufficient to support the claim that such were the probabilities. The evidence will not permit the inference that it is reasonably made to appear by a fair preponderance of the evidence that the employe met his death from a prowler.

The circumstances must be something more than merely consistent with such theory. Before petitioner may recover, the evidence must satisfy the rational mind that the death is traceable to a risk of the employment. All we have is a suggestion as to how the death may have been caused. One who overcomes the difficulty of entering such a barricaded, empty building must have been moved by some particular motive. Obviously it was not to steal from the decedent. There was nothing to steal from the building. Why did the murderer go into the building? If the circumstances answer this question, it would rather seem to us "to kill" than to support the petitioner's theory. There is nothing to indicate why Sivald was killed, though there is evidence indicating that it may have been for personal reasons. The record shows that Sivald had an enemy who was a criminal. This, however, is but a circumstance and cannot be controlling. It shows a stronger case against Durvald than against a prowler. Indeed, the circumstances accuse Durvald, and it seems upon this record to present the most plausible solution. It really seems sufficient to negative any reasonable inference that Sivald was killed by a prowler. The controlling fact, however, is the insufficiency of petitioner's proofs to support a reasonable inference that the employe's death arose out of his employment. To attempt to conclude from the evidence and permissible inferences therefrom why or by whom Sivald was killed carries us into the realm of conjecture and speculation. Awards cannot rest upon such uncertainty.

In Curran v. Newark G. C. M. Co. 37 N. J. L. J. 21, 24 (Essex C. P. 1913), 10 N. C. C. A. 642, note G, a watchman was murdered under circumstances analogous to the facts in this case, and the court said:

"It will be observed that the cases plainly distinguish between a situation disclosing facts from which an inference in favor of the

petitioner can be legitimately drawn, and a situation where the cause of the accident and the question whether it arose out of and in the course of employment must be left to speculation and conjecture. This clear distinction is the crux of the whole question. In this case I find no evidence which would justify the inference that the accident arose out of and in the course of decedent's employment. In order to find in favor of the petitioner it would be necessary for me to speculate as to which one of several possible causes might have produced the injury which resulted in the death of Curran [the watchman]. This, under the well settled decisions, I cannot do."

In Pioneer Coal Co. v. Hardesty, 77 Ind. App. 205, 133 N. E. 398, 399, another case wherein a watchman was murdered, the court used this language [77 Ind. App. 207]:

"In determining the question presented by this appeal we must bear in mind, that the burden of establishing each fact necessary to a legal award of compensation rests on the applicants. Haskell, etc., Car Co. v. Brown (1917), 67 Ind. App. 178, 117 N. E. 555; Hege & Co. v. Tompkins (1919), 69 Ind. App. 273, 121 N. E. 677. Also that such facts must be based on something more than mere guess, conjecture, surmise, or possibility. Swing v. Kokomo, etc., Co. (1919), 75 Ind. App. 124, 125 N. E. 471; St. Louis, etc. Co. v. Industrial Commission (1921), 298 Ill. 272, 131 N. E. 617.

"In the instant case there is no evidence from any witness as to who inflicted the fatal injuries on the decedent, or why they were inflicted. No one testified that he was assaulted because he was the watchman on duty, or that he was injured in the defense of his employer's property, or by reason of any other fact connected with the service in which he was engaged. This however, does not necessarily preclude a finding that the decedent received his injuries by accident arising out of his employment, as that fact may be established by circumstantial evidence. Recognizing this, we have carefully reviewed the evidence, and considered appellees' brief, in an effort to find some substantial circumstance which would support such finding, but our efforts have been unsuccessful. In fact the

surrounding circumstances are opposed to such finding. The injury was not inflicted in the office building where appellant's safe was located, or out in the yards where the coal, feed, etc., were stored, but in a shanty where nothing of substantial value was kept. The place where the struggle occurred does not indicate that the decedent had surprised his assailant in some felonious act. It rather indicates that his assailant had sought him out, and entered the shanty for the purpose of inflicting an injury upon him. The finding of a deadly weapon with blood upon it, which had been carried into the shanty from the outside, is strong evidence of that fact. This conclusion is further supported by the fact that no evidence of any theft, or attempted theft, could be found. To these circumstances may be added those which point to a motive for the assault, in no way connected with the services he was performing for appellant. In view of these facts, and the rule stated above, we are forced to the conclusion that there is no substantial evidence to sustain the finding under consideration.

"The award is reversed."

In Atlas Brg. Co. v. Industrial Comm. 314 Ill. 196, 145 N. E. 387, where a watchman came to his death by hanging, it was held that liability could not rest upon guess, speculation, or conjecture, but must be based upon facts established by the preponderance of the evidence.

In Jersey I. C. Co. v. Industrial Comm. 309 Ill. 187, 140 N. E. 862, 863, an employe while engaged in his work was shot by some unknown person. There were no witnesses to the shooting. The employe's keys, daily report, day sales in cash of $37, and $193.50 of his own money were found on his person. Nothing appeared to be missing. The court said [309 Ill. 190]:

"While it might be said that such an inference is equally reasonable with an inference that the killing was by a personal enemy, there is no evidence in the record whatever that the killing was in pursuance of an attempt to rob the deceased either of his own funds or the funds of the company or that it occurred in an altercation with a customer. The fact that nothing was taken from his

body would tend to rebut such an inference. Counsel urge that doubtless the failure to secure any money was due to the fact that immediately after the shot was fired the deceased called out to Quigless and that the robbers were frightened away. If there was any evidence whatever of robbery, such an inference might be drawn therefrom. Inferences, however, must be based on some evidence. While evidence of robbery might reasonably give rise to an inference of flight before accomplishment, due to alarm, yet flight does not, of itself, afford an inference that the motive of the killing was robbery of the employer's funds or that it occurred in an altercation with a customer. The record is barren of any evidence from which it might be concluded that the robbery theory is the more reasonable. The commission cannot choose between theories or conjectures. There must be evidence upon which to base an award. The record here does not afford such evidence and the commission was not justified in making an award. The court cannot sustain an award based not on evidence but upon theory, conjecture, or unsupported inference [cases cited]. Where the weight of the evidence supports the inference that the injury arose in the course of and out of the employment the award will be sustained. Of this character are the watchmen cases and others cited by counsel for the defense. We are of the opinion there is no such evidence in the record."

In Schmoll v. Weisbrod & Hess Brg. Co. 89 N. J. L. 150, 97 A. 723, 724, an employe was killed by an unknown person while pursuing his duties as a collector, and the court in reversing a judgment said [89 N. J. L. 153]:

"In the present case the testimony utterly fails to show any motive for the attack upon the deceased. The assailant of the deceased was unknown. His motive in making the attack was also unknown. No robbery or attempt at robbery was shown. The person who shot the deceased might have shot him out of revenge for some fancied wrong, or by mistake or by accident. There was no proven fact or circumstance before the court below that connected

the shooting either directly or indirectly with the employment of the deceased, either as driver or collector."

In Ex parte Coleman, 211 Ala. 248, 249, 100 So. 114, 115, an employe was found dead at his post of duty with his head bruised and his body burned. The court denied compensation, saying:

"It is well settled that a willful assault upon an employe, whether by a fellow workman or a third person, may be an 'accident' within the definition of the act [cases cited]. But by the very terms of our act (section 36 [2], subd. j) accidents to an employe, 'arising out of and in the course of his employment,' 'shall not include an injury caused by the act of a third person or fellow employe intended to injure the employe because of reasons personal to him,. and not directed against him as an employe, or because of his employment, * * *.'" This provision is found only in the Minnesota and Alabama acts, but the restriction, which is obvious enough, seems to have been generally recognized by the courts independently of statutory declaration. State ex rel. Common Sch. Dist. No. 1 v. District Court, 140 Minn. 470, 168 N. W. 555, 15 A. L. R. 579; Linnane v. Aetna Brewing Co., L. R. A. 1917D, note 114.

"It is of course the settled rule everywhere that these acts are to be liberally construed in favor of the workman; but this does not mean, as counsel seem to argue, that the rule as to the measure of proof, of the sufficiency of evidence, is different from the rule in ordinary cases. The burden is on the plaintiff to reasonably satisfy the trial court that the accident arose out of and in the course of the workman's employment. * * *

"The character of the wounds on the head of deceased refutes the theory of plaintiff's counsel that he could have been killed by falling forward on the machinery, and, we think, compels the conclusion that he was deliberately and intentionally killed by a human assailant, and there is an entire absence of evidence to support the required inference that the assault grew out of the employment as its juridical cause. As said in State ex rel. etc., v. District Court, 140 Minn. 470, 475, 168 N. W. 555, 556, 15 A. L. R. 579, 583:

472

" 'The employment may have given the occasion, and without the employment there might have been no opportunity, but there was no causal connection between the employment and the criminal act of the unknown assailant.' "

For an accident to arise out of the employment there must be a causal connection between the conditions under which the work is required to be performed and the resulting injury or death. Here the death, to be compensable, must be traceable to the nature of the employment. State ex rel. Common Sch. Dist. No. 1 v. District Court, 140 Minn. 470, 168 N. W. 555, 15 A. L. R. 579; Auman v. Breckenridge Tel. Co. 188 Minn. 256, 246 N. W. 889. Our statute, G. S. 1923 (1 Mason, 1927) § 4326(j), excludes results "caused by the act of a third person or fellow employe intended to injure the employe because of reasons personal to him, and not directed against him as an employe, or because of his employment." In this case the evidence is insufficient in law to support a finding of liability.

In a case of this character the burden rests upon the petitioner to establish by a fair preponderance of the evidence, including reasonable inferences from facts and circumstances shown, that the assault on Sivald arose out of his employment, had some causal connection with his employment. The employment need not be the sole cause. It must be more than the occasion. There should be some causal connection between the employment and the criminal act of the unknown assailant.

The important circumstances in this case are these: There was no reason for anyone to murder Sivald because of his employment; there was nothing in the building to steal or which would be attractive to thieves; nothing was taken from the building or in any way damaged; access to the building would ordinarily have been considered impossible; nothing was taken from the employe. It is not at all probable that robbery of the employe was the motive. The altercation did not arise at an entry of the building or at a gate or other place of access, making it plausible to draw an inference that he met his death in defense of his employer's property. Indeed, whatever little proof there is, aside from the fact of death

itself, leads away from the theory of assault in defense of the property.

There is no proof incumbent on a party who denies a fact. The negative prevails automatically without evidence either way, and must always prevail in the absence of a preponderance of proof for the affirmative. It is never enough for the affirmative to produce evidence suggesting possibility or furnishing the basis for a mere conjecture, as distinguished from a reasonable inference, in its favor.

In Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 339, 53 S. Ct. 391, 393, 77 L. ed. 503, the court said:

"We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover." See also Akerson v. G. N. Ry. Co. 158 Minn. 369, 197 N. W. 842.

Reversed.

OLSEN, JUSTICE (dissenting).

The evidence that Sivald's death arose out of his employment is necessarily circumstantial, there being no evidence as to who assaulted him or as to the circumstances of the assault. Sivald was there to watch the building, to protect it from prowlers who might otherwise gain entrance and do damage to it, as well as to watch out for fires and keep the building clean. While there was nothing in the building to steal, we take it to be well known that in an industrial section of a city near the railway yards prowlers are apt to enter vacant buildings and deface, befoul, and damage them, and by careless use of matches and cigarets may cause fires. Such persons, confronted by a watchman, may commit an assault. The character of such prowlers constitutes danger. The position of a watchman in such a building in the nighttime, in the location here shown, exposes him to hazards peculiar to his employment.

474

Maher v. Duluth Yellow Cab Co. 172 Minn. 439, 215 N. W. 678, 679, is a clear statement of the law as applied to a situation of this kind. It is there held [172 Minn. 441]:

"While the employment need not be in the category of proximate cause, it must furnish occasion or inducement."

It is further stated [172 Minn. 442]:

"So, where the evidence is all circumstantial, if a finding is supported by an inference which is clearly reasonable, the reviewing authority cannot set it aside simply because of an opposing inference which seems to it more reasonable.".

There was in that case, as in this, evidence that another person had a motive for doing violence to the one killed, although that person was not there definitely identified. The following cases tend to sustain the decision of the industrial commission: State ex rel. Anseth v. District Court, 134 Minn. 16, 158 N. W. 713, L. R. A. 1916F, 957; Kaletha v. Hall Mercantile Co. 157 Minn. 290, 196 N. W. 261; Heidemann v. American Dist. Tel. Co. 230 N. Y. 305, 130 N. E. 302; Western G. & S. Products Co. v. Pillsbury, 173 Cal. 135, 159 P. 423; Mechanics Furniture Co. v. Industrial Board, 281 Ill. 530, 117 N. E. 986; Young v. City of Brown City, 222 Mich. 706, 193 N. W. 811; Hills v. Blair, 182 Mich. 20, 148 N. W. 243, 246; John H. Kaiser Lbr. Co. v. Industrial Comm. 181 Wis. 513, 195 N. W. 329; McLaughlin v. Davis Lbr. Co. 220 Ala. 440, 125 So. 608.

The burden of proof rested upon the respondent to prove by a fair preponderance of the evidence, including reasonable inferences from facts and circumstances shown, that the assault on Sivald arose out of his employment, had some causal connection with his employment. The employment need not be the sole cause.

In State ex rel. Common School Dist. No. 1 v. District Court, 140 Minn. 470, 475, 168 N. W. 555, 556, 15 A. L. R. 579, it is said, in reference to the facts in that case:

"The employment may have given the occasion, and without the employment there might have been no opportunity, but there was no causal connection between the employment and the criminal act."

But in that case the assault was not on the premises of the master, and the facts as to how the assault occurred were fully shown and were such as to require a finding that it did not arise out of the employment. In the case last cited the court further said [140 Minn. 472]:

"When the nature of the employment is such as naturally to invite an assault, or when the employee is exposed to an assault by the character of his work, as when he is protecting or in charge of his employer's property, and the assault naturally results because of the employment and not because of something unconnected with it, so that it is a hazard or special risk of the work, the cases say that it arises out of the employment."

Other cases make substantially the same statement. As to an employment exposing a servant to more than the normal risks to which all are subject, see discussions in State ex rel. Peoples C. & I. Co. v. District Court, 129 Minn. 502, 153 N. W. 119, L. R. A. 1916A, 344, and State ex rel. Anseth v. District Court, 134 Minn. 16, 158 N. W. 713, L. R. A. 1916F, 957.

In our present case the assault happened while the employe was on the master's premises, engaged in the course of his employment in protecting his master's property and in charge thereof. In view of the nature of his employment as a night watchman in this building at the time, and the other circumstances shown, the triers of the facts could reasonably infer that the assault arose out of the employment.

While the other evidence referred to in the opinion, tending to cast suspicion upon one Durvald, and other circumstances therein referred to, would have justified the industrial commission in reaching a different result, still I do not consider that evidence at all conclusive against the finding of the commission. I think there was a prima facie case made and a question of fact for the commission. While a different inference might be drawn, it was for the industrial commission to choose which reasonable inference it concluded was sustained. We are not trying the facts here. It is of some significance that investigations were made by the authori-

ties as to the cause of Sivald's death, and that nothing to connect Durvald therewith, or to show that he was anywhere near the place at the time of the assault, was discovered or presented in this case.